AO 91 (Rev. 11/11) Criminal Complaint                          AUSA Sunil R. Harjani (312) 353-9353

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

MAY 2 1 2018

UNITED STATES OF AMERICA

v.

VISHAL SAVLA

CASE NUMBER:
**UNDER SEAL**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

18CR 310

### CRIMINAL COMPLAINT

MAGISTRATE JUDGE KIM

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about May 2014 through in or about April 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | Defendant devised, intended to devise and participated in a scheme to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing that scheme, knowingly caused a wire communication in foreign commerce on or about September 30, 2014, namely, a foreign wire transfer of approximately $99,980 from Investor B's bank account at Royal Bank of Canada to defendant's VCAP account at Chase Bank |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Mark Stakem*

**MARK STAKEM**
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: May 21, 2018

*Judge's signature*

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and Title*

## AFFIDAVIT

I, Mark D. Stakem, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation, and have been so employed for 20 years.  My current responsibilities include the investigation of white collar crime, including mail, wire and bank fraud.  During that time, I have conducted numerous financial fraud investigations and have obtained and served numerous search warrants, and conducted searches, in financial fraud investigations.  At this time, I am assigned to an FBI squad dedicated to the investigation of federal wire and mail fraud offenses, as well as related financial crimes.

2.     This affidavit is submitted in support of a criminal complaint and an application for the issuance of a search warrant.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for the criminal complaint and a search warrant application, I have not included each and every fact known to me concerning this investigation.  This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, my review of subpoenaed records, interviews of witnesses, and my training and experience, among other things.

3.     This affidavit is made for the limited purpose of establishing probable cause to support: (A) a criminal complaint to be issued in the Northern District of Illinois alleging that, from in or about May 2014 and continuing through in or about April 2018, VISHAL R. SAVLA engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme, used and caused the use of a foreign wire transfer, in violation of Title 18, United States Code, Section 1343 (wire fraud); and (B) an application for the issuance of a warrant in the Northern District of Illinois to Google, headquartered at 1600 Amphitheatre Parkway, Mountain

1

View, CA, to search SAVLA's email account, vsavla0311@gmail.com (the "**Subject Account**"),

for evidence of violations of Title 18, United States Code, Section 1343.

4.     As further stated below, there is probable cause to believe that SAVLA has engaged

in a scheme to defraud his clients for over three years through false statements and representations

about his investment of his clients' funds.  Specifically, there is probable cause to believe that

SAVLA, who managed approximately $2.2 million of client funds, falsely represented that his

clients' funds were invested in a profitable investment program in U.S. equities, futures contracts

and options contracts, when SAVLA had actually spent a portion of those client funds on his own

personal expenses and lost nearly all of the remaining funds in trading.

## Background

5.     As set forth below, SAVLA's business has involved soliciting investment funds

from approximately ten investors totaling approximately $2.2 million starting in or about August

2014.   Through his company, VCAP LLC, SAVLA offered these investors an investment

opportunity in a private investment fund that traded funds in equities, options, and futures

contracts.

6.     Futures contracts are standardized, legally binding agreements to buy or sell a

specific product or financial instrument in the future.  The buyer and seller of a futures contract

agree on a price today for a product or financial instrument to be delivered or settled in cash on a

future date.  An option contract gives the owner the right, but not the obligation, to buy or sell a

financial instrument or security, at a fixed price (strike price), on or before a specified future date

(expiration date).

7.     In March 2018, I was made aware of VCAP by three investors, Investor A, Investor

B, and Investor C.  Investors A and C reside in the Northern District of Illinois.  Investor B is a

resident of Canada. Each investor was concerned with events that transpired with their investment in VCAP. Specifically, according to the investors, SAVLA had represented that, in late December 2016, there had been a "catastrophic trading error" in VCAP earlier in the month, which caused the value of VCAP to decrease by approximately 90%. All three investors in VCAP provided documents to me for my review.

### Information Obtained About Investor A's Investment with VCAP

8.     In or about March 2018, I interviewed Investor A and also reviewed documents provided to me by Investor A. Investor A knew SAVLA through a family relationship. The documents show that, between in or about August 2014 and in or about October 2015, SAVLA caused Investor A, through an investment company (co-owned with Investor C), to invest a total of over $1 million in VCAP via "direct book transfers"[1] from Chase Bank to a VCAP account at Chase Bank. SAVLA told Investor A that VCAP trades were made at brokerage firms Livevol Securities and later at Lightspeed Trading.

9.     Prior to investing in VCAP, according to Investor A, SAVLA stated: (1) early investors in VCAP had doubled their initial investment; (2) VCAP earned around 40% returns per year investing in equities, equity options, oil futures, and the VIX volatility index; (3) SAVLA did not have to be registered as an investment advisor because VCAP was an informal trading club; (4) SAVLA traded VCAP assets from his residence in the Streeterville area in Chicago, IL; (5) SAVLA's payment from VCAP was a 60/40 profit split, that is, 60% of the pro-rata trading profits were payable to Investor A, and 40% were payable to SAVLA.

---

[1] Based on my training and experience, a "direct book transfer" is a transfer of funds between Chase bank accounts.

3

10.     SAVLA also had written agreements with Investor A, which I have reviewed.  In these written agreements, SAVLA stated he would make profit withdrawal requests from VCAP by making a written request to Investor A.  In addition, SAVLA told Investor A he would take his profit withdrawals from VCAP at year-end.

11.     During 2015, according to Investor A, SAVLA's payment became a 80/20 profit split, where 80% of the VCAP trading profits were payable to Investor A, and 20% were payable to SAVLA.

12.     According to Investor A, SAVLA maintained regular contact with Investor A during 2014, 2015 and 2016.  Most of SAVLA's contact with Investor A was via email from  the **Subject Account**.  Specifically, SAVLA sent Investor A from the **Subject Account** monthly email summaries that showed purported returns of VCAP.  The email summaries sent by SAVLA, which I have reviewed, stated the returns of VCAP were approximately 54% during the last five months of 2014, 67% during 2015, and 47% from January through November 2016.  Occasionally, SAVLA sent Investor A purported account statements from Livevol and Lightspeed.  At times, the emails listed specific securities or commodities VCAP was purportedly trading.

13.     During 2016, Investor A told SAVLA he wanted VCAP to be a more formal trading entity, to have more accurate reporting of VCAP trades, and that he wanted an audit of VCAP.  According to Investor A, SAVLA stated this could not happen because VCAP had a proprietary trading system that no one except SAVLA was allowed to view and the changes mentioned by Investor A would be too costly.  Investor A made it clear to SAVLA that he wanted to withdraw his balance from VCAP by the end of 2016.

14.     Sometime during the last ten days of 2016, according to Investor A, SAVLA told Investor A by phone that VCAP had a "catastrophic trading error" that caused the value of VCAP

4

assets to fall by around 90% in a single day. SAVLA initially stated the asset value drop was due to a "fat finger trade," which according to Investor A, meant that SAVLA made a quantity error when entering a trade. Later, through an attorney, SAVLA sent a purported Securities and Exchange Commission (SEC) form TCR (which is an acronym for Tips, Complaints and Referrals) to Investor A. The TCR was purportedly filed by Lightspeed and SAVLA, and claimed inside information in the trading of 10,000 call options of a company named Tailored Brands, ticker symbol TLRD, by an unknown entity. SAVLA blamed the "catastrophic trading error" on this purported insider trading of TLRD.

15. In or about December 2016 or early 2017, SAVLA also sent Investor A a VCAP investor list, which I have reviewed. The list showed that there were 11 investors in VCAP, including SAVLA. According to this list, the total amount of investment in VCAP by the ten investors, excluding SAVLA, was over $2.4M.

16. During February and March 2017, according to Investor A, Investor A received approximately $433,000 from SAVLA. This amount represented a repayment of part of Investor A's principal invested in VCAP. SAVLA said the source of these funds used to repay Investor A was SAVLA's relatives.

17. In 2017, according to Investor A, SAVLA told Investor A approximately $537,000 remained frozen in the VCAP account at Lightspeed. In approximately February 2018, SAVLA provided Investor A with a purported VCAP account statement at Lightspeed, which showed the approximate $537,000 balance. SAVLA said these Lightspeed funds were frozen due to an SEC investigation of TLRD that affected VCAP's capital.

**Information Obtained About Investor B's investment with VCAP**

18.     In or about March 2018, I interviewed Investor B and also reviewed documents provided to me by Investor B.  Investor B lives in Canada.  The documents show that, in or about September 2014, SAVLA caused Investor B to invest $100,000 in VCAP via wire transfer from Canada to a VCAP account at Chase Bank.

19.     Prior to investing in VCAP, according to Investor B, SAVLA told Investor B: (1) VCAP was a private investment venture for friends and family that would trade options and futures;  (2) Investor B should keep the potential investment opportunity in VCAP a secret;  (3) VCAP earned around 45% returns during the first quarter of 2014 investing in options and futures; (4) SAVLA's payment from VCAP was a 50/50 profit split, that is, 50% of the pro-rata trading profits in VCAP for Investor B were payable to Investor B, and 50% were payable to SAVLA.

20.     In addition, SAVLA had a written agreement with Investor B, which I have reviewed.   In this written agreement, SAVLA stated he would make profit split withdrawal requests from VCAP by making a written request to Investor B.

21.     According to Investor B, SAVLA maintained regular contact with Investor B during 2014, 2015 and 2016.  Most contact was via email from the **Subject Account**.  SAVLA sent Investor B from the **Subject Account** monthly email summaries, which I have reviewed, that contained purported returns of VCAP.  The email summaries sent by SAVLA stated the returns of VCAP were approximately 51% during the last three months of 2014, 67% during 2015, and 47% from January through November 2016.

22.     On or about December 6, 2016, SAVLA called Investor B.  According to Investor B, SAVLA said he pushed the wrong button on a trade and a trading error resulted.  SAVLA stated that VCAP experienced a loss of capital of around 90%.  SAVLA said the SEC was investigating

the trading error and froze the remaining funds in VCAP's trading account. SAVLA summarized the purported December 2016 VCAP trading loss in an email, but SAVLA stopped sending Investor B account statements after this call.

23.     Sometime prior to April 2017, SAVLA had communicated to Investor B that Investor B's VCAP balance was $32,817. In or about December 2017, Investor B sought clarity on his account at VCAP, and he emailed SAVLA. Investor B emailed SAVLA at the **Subject Account**. SAVLA responded by the **Subject Account** stating that he would speak with Investor B by phone, but Investor B and SAVLA did not speak by phone after this email exchange.

### Information Obtained About Investor C's Investment with VCAP

24.     In or about March 2018, I interviewed Investor C and also reviewed documents provided to me by Investor C. Investor C and Investor A were involved with the allocation of capital from their investment company that invested in VCAP, as described above. As previously mentioned, this investment company invested over $1 million in VCAP. Separately, Investor C invested his own capital with VCAP as detailed below. Investor C conveyed to me much of the same information about SAVLA as did Investor A.

25.     The documents show that, between in or about September 2015 and in or about October 2015, SAVLA caused Investor C to invest approximately $750,000 of his own capital in VCAP via "direct book transfers" from Chase Bank to a VCAP account at Chase Bank. SAVLA told Investor C that VCAP trades were made at brokerage firms Livevol Securities and later at Lightspeed Trading.

26.     Prior to investing in VCAP, according to Investor C, SAVLA told Investor C: (1) early investors in VCAP had doubled their initial investment; (2) VCAP earned around 40% returns per year investing in equities, equity options, oil futures and the VIX volatility index; (3)

SAVLA did not have to be registered as an investment advisor because VCAP was an informal trading club; (4) SAVLA traded VCAP assets from his residence in the Streeterville area in Chicago, IL; (5) SAVLA's payment from VCAP for Investor C's investment with Investor A in VCAP was a 60/40 profit split, that is, 60% of the pro-rata trading profits in VCAP for Investor C were payable to Investor C, and 40% were payable to SAVLA.

27.     In addition, SAVLA had written agreements with Investor C, which I have reviewed.  In these written agreements, SAVLA stated he would make profit split withdrawal requests from VCAP by making a written request to Investor C.  In addition, SAVLA told Investor C he would take his profit split withdrawals from VCAP at year-end.

28.     During 2015, according to Investor C, SAVLA's payment became a 80/20 profit split, where 80% of the pro-rata trading profits in VCAP for Investor C were payable to Investor C, and 20% were payable to SAVLA.

29.     According to Investor C, SAVLA maintained regular contact with Investor C during 2014, 2015, and 2016.  Most contact was via email from the **Subject Account**.  SAVLA sent Investor C monthly email summaries from the **Subject Account** that contained purported returns of VCAP.  The email summaries sent by SAVLA, which I have reviewed, stated the returns of VCAP were approximately 54% during the last five months of 2014, 67% during 2015, and 47% from January through November 2016.  Occasionally, SAVLA sent Investor C purported account statements from Livevol and Lightspeed.   Sometimes, the emails listed specific securities or commodities VCAP was purportedly trading.

30.     During 2016, Investor C, along with Investor A, told SAVLA they wanted VCAP to be a more formal trading entity, to have more accurate reporting of VCAP trades, and an audit of VCAP.  SAVLA said this could not happen, as VCAP had a proprietary trading system that no

one except SAVLA was allowed to view and the changes mentioned by Investor C would be too costly. Investor C made it clear to SAVLA he wanted to withdraw his balance from VCAP by the end of 2016.

31.    Sometime during the last 10 days of 2016, according to Investor C, SAVLA told Investor C by phone that VCAP had a "catastrophic trading error" that caused the value of VCAP assets to fall by around 90% in a single day. SAVLA initially said the asset value drop was due to a "fat finger trade." Later, SAVLA claimed insider trading of 10,000 call options of a company named Tailored Brands, ticker symbol TLRD, by an unknown entity, was to blame for the "catastrophic trading error."

32.    During February and March 2017, Investor C received around $400,000 from SAVLA. This amount represented a repayment of part of Investor C's principal invested in VCAP. SAVLA said the source of these funds used to repay Investor C was SAVLA's relatives.

33.    In 2017, SAVLA told Investor C approximately $500,000 to $600,000 remained frozen in the VCAP account at Lightspeed. SAVLA said these Lightspeed funds were frozen due to a SEC investigation of the insider trading issue of TLRD that affected VCAP's capital.

### Financial Analysis of Interactive Brokers Trading Records

34.    Interactive Brokers (IB), an online brokerage, produced trading records as part of this investigation. Though IB cleared trades for SAVLA and VCAP, the accounts were serviced by Livevol from December 2013 through approximately June 2015, and by Lightspeed from approximately June 2015 through March 2018.[2]

---

[2] Based on my knowledge and experience, cleared trades meant IB acted as the intermediary to reconcile orders between a buyer and a seller. Accounts serviced by Livevol and Lightspeed meant Livevol and Lightspeed provided administrative services for the account, including the distribution of monthly account statements.

35.     According to records received from IB, in or around December 30, 2013, an IB Rollover IRA in the name of SAVLA's Family Member A was opened at IB and had an account number ending in 4071, and the account number ending in 4071 was funded with $200,000. According to Investor A, Family Member A is the father of SAVLA. According to the VCAP investor list Investor A received from SAVLA, Family Member A was also listed as a VCAP investor with $200,000 in principal.

36.     I have reviewed the trading records received from IB for account number x4071. On the account opening documents of IB account number ending in 4071, SAVLA's home address was listed as the mailing address for the account and **Subject Account** was listed as the contact email address. This IB account traded equities and options on equities. Trading of the $200,000 was unprofitable in 7 of the 8 months the account was traded. By August 2014, this IB account had a $0 balance.

37.     On or about August 6, 2014, an IB account titled VCAP was opened by SAVLA, and it had an account number ending in 8031. On the account opening documents of this VCAP account, SAVLA's home address was listed as the mailing address for the account and the **Subject Account** was listed as the contact email address.

38.     I have reviewed the trading records received for this VCAP account. Trading in the VCAP account commenced in August 2014. Between August 2014 and January 2017, the VCAP account received approximately $2,050,000 from Investors A, B, C and other investors. The VCAP account traded mainly equities and options on equities, but occasionally futures contracts were traded. Taking into account the trading in IB account number ending in 4071 with the VCAP account, trading in the accounts was cumulatively unprofitable in every month, with the exception of November 2015, when the VCAP account had a cumulative positive return of

approximately 2.18% as of November 30, 2015. That means, as of November 30, 2015, his trading was up only 2.18% from the inception of trading. However, after that date, SAVLA continued to lose money in trading. Trading in the VCAP account was unprofitable in 25 of the 30 months there was account activity. By on or about March 31, 2016, the VCAP account had a balance of approximately $29,071. By on or about January 31, 2017 the VCAP account had a balance of approximately $69.

## Comparison of SAVLA's Representations to Investors with Subpoenaed Account Records

39.     As shown above, there is probable cause to believe that SAVLA provided false monthly VCAP account statements and summaries to Investors A, B and C between 2014 and 2016 using the **Subject Account**. According to subpoenaed account records described above, the VCAP account lost approximately 96% during 2014, gained 13% during 2015, and lost over 99% between January 2016 and November 2016. In contrast, SAVLA reported *positive* VCAP annual returns to Investors A, B and C for 2014 and for January through November 2016. SAVLA also represented a larger annual return of 67% during 2015.

40.     As another example, on or about November 30, 2016, the VCAP account had an account balance of only approximately $7,554. However, SAVLA reported to Investors A, B, and C their cumulative VCAP account balance was over $3.5 million as of November 30, 2016. The VCAP IB trading records indicated that while VCAP lost approximately 90% of its value during December 2016, the beginning balance was only $7,554. Additionally, SAVLA incurred these losses in approximately 9 call and put option positions, none of which were TLRD. The lack of any VCAP account positions in TLRD in December 2016, and the small account balance of $7,554, indicated there is probable cause to believe there was no "fat finger trade" in TLRD made by SAVLA in December 2016, in contrast to what was represented to Investors A and C by SAVLA.

11

41. In addition, as shown above, there is probable cause to believe that SAVLA provided multiple false Lightspeed VCAP account statements to Investor A for the time period January 2016 through January 2018. On or about January 31, 2016, the VCAP account had an actual account balance of approximately $341,274, while the VCAP Lightspeed statement that SAVLA provided Investor A showed a false VCAP account balance of approximately $4.3 million. Additionally, on or about January 31, 2018, the VCAP account had an actual account balance of less than $100, while the VCAP Lightspeed account statement that SAVLA provided Investor A showed a false VCAP account balance of approximately $537,000. I have also interviewed a representative from Lightspeed in approximately March 2018 and showed him the statements provided by SAVLA. The Lightspeed representative told me that the statements were fake.

42. In addition, there is probable cause to believe that SAVLA provided false information to Investors A, B and C about the status of VCAP funds at Lightspeed. SAVLA told Investor A, B and C that approximately $537,000 of VCAP funds were frozen at Lightspeed due to an SEC investigation. In May 2018, a representative from Lightspeed advised me there were no funds frozen in the VCAP account at any time, and Lightspeed was not made aware of any investigation by the SEC or any regulatory agency that would have necessitated freezing funds in the VCAP trading account.

43. Moreover, as shown above, there is probable cause to believe that SAVLA made false representations about the TCR document purportedly submitted to the SEC, and provided to Investor A. In March 2018, a representative from Lightspeed told me Lightspeed did not file this TCR with the SEC, in contrast to what was communicated to Investors A. Also, in May 2018, I communicated with a representative from the Chicago SEC office. According to the SEC

12

representative, this TCR pertaining to TLRD was not received by the SEC, and there was no investigation of insider trading of TLRD between in or about December 2016 and in or about May 2018. Additionally, the trading records from the VCAP account do not indicate SAVLA had any security positions in TLRD during December 2016.

### Financial Analysis of SAVLA's Use of Investor Funds for Personal Expenses

44.    I have reviewed financial records to determine if SAVLA used any investor funds for his own personal expenses. SAVLA maintained multiple accounts at Chase Bank (Chase) from the time period July 2014 through January 2017. SAVLA opened a VCAP checking account, with an account number ending in 0289 at Chase (Chase VCAP account) on or about July 23, 2014. SAVLA was the sole signatory on the Chase VCAP account. SAVLA and Family Member A were signatories on another checking account (ending in 2185) opened at Chase in or about 2003 (Chase personal account).

45.    I have reviewed Chase VCAP and personal account records. SAVLA received around $2.29 million from VCAP investors between June 2014 and January 2017 into the Chase VCAP account. Around $2.05 million of these investor funds were transferred by SAVLA to the IB VCAP account. Around $10,000 of these VCAP funds were spent by SAVLA in Las Vegas and for a concert directly from the Chase VCAP.

46.    The remainder of the investor funds, approximately $250,000, were transferred by SAVLA. All of the transfers by SAVLA went to the Chase personal account. Once the funds were transferred by SAVLA from the Chase VCAP to the Chase personal account, they were spent on personal living expenses, for example at retailers, restaurants, grocery stores, etc. Many of the expenditures between approximately February 2015 and January 2017 were made in California.

Investors A and C advised me that SAVLA and his wife moved to California during this time period.

47.     After reviewing SAVLA's CHASE bank records, there is probable cause to believe that SAVLA misappropriated a portion of the VCAP investors' funds. As previously mentioned, SAVLA had written agreements with VCAP Investors A, B and C. In these written agreements, it stated that SAVLA would make profit split withdrawal requests from VCAP after written communications with Investors A, B and C.   According to Investors A, B, and C, they did not receive or sign any authorization for profit withdrawals and, in fact, SAVLA said he was leaving his share of the purported VCAP profits in VCAP. In addition, SAVLA told Investor A and C he would take his profit split withdrawals from VCAP at year-end. As previously stated, VCAP did not have a cumulative trading profit at year-end 2014, 2015 or 2016, and thus SAVLA was not entitled to retain any of the VCAP investors' funds for himself.

## Use of Wires and Mails

48.     There is probable cause to believe that SAVLA used or caused the use of a foreign wire transfer in carrying out the scheme to defraud.

49.     On or about September 30, 2014, according to Chase Bank records, Investor B transferred approximately $100,000, less a wire transfer fee of $20, from Investor B's account at Royal Bank of Canada to SAVLA's account at Chase Bank. Based on the geographic location of SAVLA and Investor B (who resides in Canada), and based on my training and experience, there is probable cause to believe that SAVLA caused the use of a foreign wire transfer.

## Request for the Issuance of a Criminal Complaint

50.     Based upon the foregoing information, there is probable cause to believe that, beginning in or about August 2014 and continuing until in or about February 2018, SAVLA

14

devised, intended to devise and participated in a scheme to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing that scheme, used and caused to be used a foreign wire transfer. In particular, for the purpose of executing the scheme to defraud, SAVLA knowingly caused a wire communication in foreign commerce on or about September 30, 2014, namely, a foreign wire transfer of approximately $99,980 from Investor B's bank account at Royal Bank of Canada to SAVLA's VCAP account at Chase Bank, in violation of Title 18, United States Code, Section 1343.

### Request for the Issuance of a Search Warrant on the Subject Account

51.     There is also probable cause to believe that evidence of a violation of Title 18, United States Code, Section 1343, as further described in Attachment A will be located in the **Subject Account**, as further described in Attachment A.

52.     Based on my training and experience and information available from Google's website (google.com), I have learned the following information about Google and Gmail:

a.      Google offers a collection of Internet-based services, including e-mail and online data storage, which is owned and controlled by Google. The services are available at no cost to Internet users, though there are certain options, such as additional online data storage, that users may elect to pay money to receive. Subscribers obtain an account by registering on the Internet with Google and providing Google with basic information, including name, gender, zip code, and other personal/biographical information. Subscribers are given a Google account which ends in "@gmail.com" which is utilized to access these online services.

b.      Google maintains electronic records pertaining to the individuals and entities who maintain Google online subscriber accounts. These records often include account

access information, e-mail transaction information, account application information, and in some circumstances billing and payment information.

c.     Any e-mail that is sent to a Google online account subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by Google. If the message is not deleted by the subscriber, the account is below the maximum storage limit, and the subscriber accesses the account periodically, that message can remain on Google's servers indefinitely.

d.     When a subscriber sends an e-mail, it is initiated by the user, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google online account users have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail may remain on the system indefinitely.

e.     Google online account subscribers can store files, including but not limited to e-mails, documents, and image files, on servers maintained and/or owned by Google. The online data storage service is known as "Google Drive."

f.     Google online account subscribers can also utilize a feature known as "History" that allows a user to track various historical account activity, including past Google Internet searches performed, information regarding devices which have been used to login to the Google online account, and physical location information regarding from where the Google online account was accessed.

g.     Google keeps records that can reveal accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked

by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites.

53.     Therefore, the computers of Google are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Google, such as account access information, transaction information, and account application. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Google, to protect the rights of the subjects of the investigation and to effectively pursue this investigation, authority is sought to allow Google to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A.

54.     I have reviewed an email provided to me by Investor A. On or about April 7, 2014, SAVLA sent Investor A an email from the **Subject Account**. In the email, SAVLA wrote to Investor A that SAVLA had achieved a 45% return in trading in the first quarter of 2014. My analysis of IB trading records concluded that SAVLA lost approximately 90% in the trading account ending in 4071 at IB during the first quarter of 2014.

55.     I have reviewed an email provided to me by Investor B. On or about January 12, 2015, SAVLA sent Investor B an email from the **Subject Account**. In the email, SAVLA wrote to Investor B that during 2014, SAVLA achieved a 30.71% return on Investor B's investment in VCAP. My analysis of IB trading records show the balance of the VCAP account as of December 31, 2014 was $14,739, which is a loss of at least approximately 85% on Investor B's VCAP investment during 2014.

17

56.     I have reviewed an email provided to me by Investor C.  On or about October 2, 2015, SAVLA sent Investor C and Investor A an email from the **Subject Account.**  In the email, SAVLA wrote to Investors C and A that their two separate investments in VCAP had 2015 returns through August 30, 2015, of 47.54% and 18.17%  My analysis of IB trading records show the VCAP account experienced significant trading losses between January and August 2015.  As of August 30, 2015, the account balance of VCAP was $87,915.  Because approximately $800,000 was invested in VCAP by investors between January and August 2015, this calculates to at least an approximate 89% loss on Investor A and Investor C's VCAP investment from January 2015 through August 2015.

57.     In response to a subpoena issued to Google, Google confirmed the **Subject Account** was registered to VISHAL SAVLA since approximately February 2006.  Google also provided me with the telephone number SAVLA provided to Google, which was the same telephone number SAVLA provided to Investors A, B and C as his contact telephone number.

58.     Based upon my training and experience in serving search warrants, and the training and experience of law enforcement officers with whom I have spoken, I am aware that individuals who run investment businesses use electronic mail to communicate with investors.  This financial information can include information related to names of clients, client account statements, bank statements, brokerage statements, correspondences with clients, and statements about total assets under management for each client.  Similarly, based upon my training and experience, I am aware that individuals often send over electronic mail information about their personal finances, which can include personal bank account statements, personal brokerage statements, personal mortgage statements, and records relating to assets and liabilities and personal income and expenditures of funds.

## Search Procedure for the Subject Account

59.     In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of Google to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a.     The search warrant will be presented to Google personnel who will be directed to the information described in Section II of Attachment A;

b.     In order to minimize any disruption of computer service to innocent third parties, Google employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II of Attachment A, including an exact duplicate of all information stored in the computer accounts and files described therein;

60.     Google employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant; and

61.     Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from Google employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

### Conclusion

62.     Based on the above information, I respectfully submit that there is probable cause to believe that wire fraud offenses, in violation of Title 18, United States Code, Section 1343, have been committed by SAVLA, and that evidence relating to this criminal conduct will be found in the **Subject Account**, and therefore respectfully request that this Court issue a criminal complaint for SAVLA and a search warrant for the **Subject Account** authorizing the seizure of items described in Attachment A.

FURTHER AFFIANT SAYETH NOT.

MARK STAKEM
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 21st day of May 2018, at Chicago, Illinois.

The Honorable Young B. Kim
United States Magistrate Judge

20